# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| CHAD DAFOE, | Civil No. 14-239 (JRT/TNL) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BNSF RAILWAY COMPANY, | |
| Defendant. | |

Michael F. Tello and Michael P. McReynolds, **TELLO LAW FIRM**, 2150 Third Avenue North, Suite 10, Anoka, MN 55303, for plaintiff.

Joanne R. Bush and William R. Taylor, **JONES DAY**, 717 Texas Avenue, Suite 3300, Houston, TX 77002, and Lee A. Miller and Sally J. Ferguson, **ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, PA**, 81 South Ninth Street, Suite 500, Minneapolis, MN 55402, for defendant.

Plaintiff Chad Dafoe, a train conductor, brings this lawsuit against his former employer, Defendant BNSF Railway Company ("BNSF"), alleging that BNSF violated anti-retaliation provisions of the Federal Railroad Safety Act ("FRSA") by firing him for engaging in protected activity, including making safety complaints, reporting personal injuries, and being involved in a co-worker's FRSA case. BNSF now moves for summary judgment. BNSF also moves to exclude expert testimony from Dafoe's expert, Paul Byrnes. Because there is no genuine issue of material fact as to whether Dafoe's protected activity was a contributing factor in his dismissal, or, alternatively, because BNSF has shown by clear and convincing evidence that it would have fired Dafoe even in absence of his protected activity, the Court will grant BNSF's motion for summary

judgment.  The Court will also deny as moot BNSF's motion to exclude the expert testimony of Paul Byrnes.

## BACKGROUND

BNSF operates a freight railroad in parts of the United States and Canada, including in Minnesota.  Dafoe worked for BNSF for over fifteen years, from May 9, 1994, until he was terminated on September 26, 2011, purportedly for committing three "serious" rule violations.  At the time of his termination, Dafoe was a train conductor working out of BNSF's yard in Willmar, Minnesota.  The Willmar yard is a part of BNSF's Twin Cities Division.

## I.   BNSF DISCIPLINARY PROCEDURES

Dafoe is a member of the United Transportation Union ("UTU"), which has a collective bargaining agreement ("CBA") with BNSF.  Pursuant to the CBA, BNSF is required to follow a series of procedures before it may discipline a conductor, such as Dafoe, for rule violations.  (Decl. of Gina Hall-Lopez ("Hall-Lopez Decl."), Ex. F, Aug. 1, 2015, Docket No. 63.)  First, if BNSF believes that a conductor has violated a rule, it must provide the conductor with a written notice of investigation explaining the allegations.  (*Id.* at 3.)  Then, BNSF must conduct a "full and impartial investigation," unless the conductor waives his or her right to an investigation, in which case BNSF may impose discipline immediately.  (*Id.*)  The investigation itself is an adversarial proceeding presided over by a BNSF investigating officer.  (*Id.*)  At the investigation, the conductor may be represented by a fellow employee, offer witnesses and evidence, and question

witnesses presented by BNSF.  (*Id.*)  After the investigation is completed, a BNSF investigating officer must issue a decision either exonerating the conductor or finding that the conductor is responsible for the alleged misconduct.  (*Id.* at 4-5.)  The conductor has a right to appeal the result. (*Id.* at 4.)  If the conductor is found responsible for the misconduct, BNSF may impose discipline.  (*Id.* at 3-4.)  Discipline is imposed pursuant to BNSF's Policy for Employee Performance Accountability, otherwise known as PEPA. (Hall-Lopez Decl., Ex. G ("PEPA").)  An employee who is found to have committed a serious rule violation will receive a 30-day record suspension and, in general, a 36-month review, or probationary, period.  (*Id.* at 4.)  If the employee commits a second serious rule violation within the review period, he or she may be fired.  (*Id.*)  BNSF may also fire an employee for "stand alone" dismissible conduct, which includes committing two serious rule violations during the same tour of duty.  (*Id.* at 4, 6.)  Before an employee may be fired, however, BNSF's senior management must review the decision.  (*Id.* at 4.)

## II.     ALLEGED SERIOUS RULE VIOLATIONS

Pursuant to the above-described disciplinary framework, BNSF determined that Dafoe committed three serious rule violations.  The facts underlying these alleged violations, as well as Dafoe's subsequent termination, are as follows.

On August 20, 2011, Dafoe was the conductor on a train traveling from BNSF's Northtown yard to its Willmar yard.  (Decl. of Joanne R. Bush ("Bush Decl."), Ex. S ("Dafoe Dep. 1") at 202:10-20 Aug. 1, 2015, Docket No. 64.)  Also on the train were engineer James Layman and engineer pilot Corey Spencer.  As the train was leaving the

Northtown yard, Dafoe received a radio communication from David Dodds, a carman in the Northtown yard.  (*Id.* at 204:1-23.)  Dodds' duties as carman included performing a visual roll-by inspection of Dafoe's outgoing train for potential problems.  (*Id.* at 204:8-23; Bush Decl., Ex. U ("Canchola Dep.") at 29:7-14.)  Dodds informed Dafoe over the radio that the angle cock on the train appeared to be "slightly turned" and advised him that "maybe you could take a look at it if you stop."  (Dafoe Dep. 1 at 204:9-14.)  BNSF regulations expressly prohibit operating a train with a slightly closed angle cock; such conduct constitutes a serious rule violation under PEPA.  (*See* Hall-Lopez, Exs. A, H; PEPA at 5.)

Despite receiving this radio notice from Dodds, Dafoe did not stop the train to investigate.  (Dafoe Dep. 1 at 214:1-14.)  When the train made a scheduled stop in Atwater, Minnesota, Dafoe again did not investigate or close the angle cock.  (*Id.*)  The train subsequently completed its trip to the Willmar yard.  At some point in the next few days, Dafoe voluntarily informed two of his superiors that he had failed to stop and check the angle cock after being notified by carman Dodds that it might be slightly closed.  (*Id.* at 220:1-17; Bush Decl., Ex. W at 36:2-23.)  As a result of this disclosure, BNSF issued notices of investigation on August 25, 2011, to Dafoe, Layman, and Spencer.  (Hall-Lopez Decl., Ex. E.)  Notably, BNSF did not issue a notice of investigation to carman Dodds.  Layman and Spencer were later exonerated after BNSF determined that they were not privy to Dodds' radio communication.  (*See* Hall-Lopez Decl., Ex. I.)

Also on August 20, 2011, BNSF's Twin Cities Division commenced a random safety audit of various trains, including Dafoe's train.  (Bush Decl., Ex. T ("Lund Dep.

1") at 40:19-22; 68:9-14.)  Although such audits occur semi-regularly, this one was in response to several serious safety violations that had occurred recently in Sioux City, Iowa.  (*Id.* at 39:3-14, 44:21-45:4.)  One of the individuals involved in the audit was Michael Lund, the Superintendent of Operating Practices for the Twin Cities Division. (*Id.* at 29:8-14.)  Lund reviewed "event recorder data" and radio transmissions from Dafoe's train and concluded that Dafoe and Layman committed two serious rule violations under PEPA.  (Bush Decl., Ex. V at 3; Hall-Lopez Decl., Ex. J; PEPA at 5.) First, Lund concluded that Dafoe and Layman improperly bottled air in the braking system after the train arrived in the Willmar yard.  (Bush Decl., Ex. V at 3.)  Second, Lund concluded that Dafoe walked in between train equipment in the Willmar yard without following required safety procedures.  (*Id.*)  On August 23, 2011, BNSF issued notices of investigation for both incidents to Dafoe and Layman.  (Hall-Lopez Decl., Ex. B.)

On September 12, 2011, Dafoe signed a waiver accepting responsibility for the angle cock violation.  (*Id.*, Ex. H.)  The formal investigation for that incident was cancelled, Dafoe accepted a serious rule violation under PEPA, and he was given a 30-day record suspension and a 3-year review period.  (*Id.*)

On September 13, 2011, BNSF held a formal investigation for the remaining two alleged serious rule violations – bottling air and walking in between train equipment without following required safety procedures.   John Wright, a Superintendent of Operations at BNSF, presided over the investigation.  (*Id.*, Ex. D ("Investigation Tr.") at 1-2; *Id.*, Ex. L ("Dismissal Letter").)  William Fry, a fellow BNSF employee and UTU

member, represented Dafoe.  (Investigation Tr. at 2:11-12.)  Various individuals gave
testimony.  Jake Demarais, a road foreman, testified on behalf of BNSF.  Dafoe, Layman,
and Spencer testified on behalf of Dafoe.  (*Id.* at 1.)  Dafoe also had the opportunity to
question Demarais and present evidence.

Thomas Albanese, General Manager of the Twin Cities Division, had final
authority to determine whether Dafoe committed the serious rule violations; Albanese
was also responsible for recommending the appropriate discipline.[1]  (Bush Decl., Ex. X
("Albanese Dep.") at 92:1-11.)  After reviewing the investigation transcript, exhibits,
event recorder data, and radio transmissions, and receiving input from Lund, Albanese
ultimately concluded that Dafoe committed both serious rule violations and
recommended dismissal.  (*Id.* at 36:24-37:20, 49:16-22, 74:16-22, 92:1-24, 107:3-9;
Dismissal Letter.)  Andrea Smith, Director of Labor Relations for BNSF, reviewed
Albanese's decision and concurred with his recommendation.  (Bush Decl., Ex. II
("Smith Dep.") at 59:7-9; *id.*, Ex. JJ at 2-3.)  Dafoe was terminated effective September
26, 2011.  (Dismissal Letter.)  BNSF also terminated Dafoe's crewmate, engineer James
Layman, on the ground that he shared culpability with Dafoe for bottling air.  (Hall-
Lopez Decl., Ex. K.)

Dafoe filed two separate appeals pursuant to the CBA, but both were denied.  (*Id.*,
Exs. M, N.)  Dafoe then submitted a claim to the Public Law Board ("PLB"), a three-

---

[1] Albanese became the General Manager of the Twin Cities Division in April 2011.
(Albanese Dep. at 30:25-31:2.)  Prior to that, Albanese was General Manager of BNSF's Powder
River Division in Gillette, Wyoming.  (Albanese Dep. at 30:8-31:2.)

person panel organized pursuant to the Federal Railway Law Act.  (*Id.*, Ex. O.)  The PLB panel consisted of a BNSF representative, a union representative, and a neutral third party.  (*Id.* at 3.)  The PLB, by a vote of two to one, also denied Dafoe's claim.  (*Id.*)  Next, Dafoe filed an FRSA complaint with the Occupational Safety and Health Association ("OSHA"), but OSHA dismissed the complaint.  (Bush Decl., Exs. Y, AA.)  Dafoe objected and requested a *de novo* hearing before an administrative law judge.  Dafoe subsequently withdrew his OSHA objection by commencing this action (*See* Compl., Jan. 24, 2014, Docket No. 1; *id.*, Ex. 1.)

## III.   THIS LITIGATION AND ALLEGED PROTECTED ACTIVITIES

In his complaint, Dafoe asserts that BNSF fired him in retaliation for engaging in protected activity in violation of the FRSA.  Dafoe cites three protected activities: making safety complaints, reporting personal injuries, and appearing in an interrogatory answer for a co-worker's FRSA case.  These alleged protected activities are described below.

### A.   Safety Complaints

During his tenure with BNSF, Dafoe alleges that he made numerous safety complaints, both formal and informal, to BNSF management.  According to Dafoe, he was a well-known safety advocate.  From August 2005 until his termination, Dafoe submitted seven formal complaints pursuant to BNSF's Safety Issue Resolution Process; such complaints are referred to as SIRPs.  (Hall-Lopez Decl., Ex. Q.)  Dafoe filed his last SIRP on April 29, 2010.  (*Id.* at 7.)  Dafoe also made numerous verbal and/or informal complaints, outside of the formal SIRP process.  Beginning in 1996, Dafoe complained

three to four times per year about snow depth and inadequate snow removal in the rail yard.   (Dafoe Dep. 1 at 108:11-13, 122:2-10.)   Between 2009 and 2011, he made numerous complaints regarding inadequate air brake testing.   (*Id.* at 159:17-23.)   Dafoe also informally complained about poor lighting in the rail yard in the early 2000s, (*id.* at 131:19-22); inadequate weed removal every year beginning in 2004, (*id.* at 108:4-10, 118:5-13); a cockeyed seat on a utility vehicle at some point between 2004 and 2007 (*id.* at 140:1-25); ice buildup on walkways and engines in 2008, (*id.* at 134:1-7); train line-up problems when he worked as a "footboard yardmaster," (*id.* at 108:16-21); and poor lighting and walking surfaces in Dassel, Minnesota from 2008 until 2010, (*id.* at 128:10-129:24).   Dafoe also alleges that he complained directly to Albanese on two or three occasions.   In two separate phone calls, for example, Dafoe contends that he complained to Albanese about snow removal and air brake testing.   (*Id.* at 119:19-25, 122:19-25, 158:17-160:21; Albanese Dep. at 30:25-31:2.)

## B.   Personal Injury Reports

Dafoe also suffered several personal injuries during his tenure with BNSF.   On July 1, 2011, Dafoe notified a supervisor that he fell down after grabbing onto a broken handrail.   (*Id.* at 78:14-79:24; Hall-Lopez Decl., Ex. R.)   Although Dafoe admits that he did not file a formal injury report and also advised his supervisor that he did not intend to claim an injury, he nevertheless asserts that he injured his butt.   (Dafoe Dep. 1 at 79:1-21; Hall-Lopez Decl., Ex. R.)   In May 2010, Dafoe experienced dizziness and numbness in his arm while at work, and was transported by ambulance to the hospital.   (Dafoe Dep. 1

at 81:9-13.)  Dafoe had worked several days in a row on short rest, and doctors diagnosed him with fatigue.  Dafoe was not prescribed any medication, did not undergo any procedures, and was cleared to return to work the next day.  (*Id.* at 81:19-82:4.)  While Dafoe did not file a formal injury report, various BNSF employees were aware of the incident.  (*Id.* at 82:15-25; 84:1-5.)  In or around 2004, Dafoe injured his shoulder, back, and neck when a utility vehicle he was driving "was struck by five engines."  (*Id.* at 84:11-21.)  Around 1999, Dafoe missed time from work after a "knuckle" fell on top of his foot.  (*Id.* at 84:22-85:7.)  And, in the late 1990s, Dafoe suffered a "soft tissue injury" in his lower back and missed two weeks of work after twisting to give "car signs on the side of a car."  (*Id.* at 85:14-86:2).

## C.     Appearance in an Interrogatory Answer

Finally, Dafoe's name appeared in an interrogatory answer for an FRSA case involving one of Dafoe's former co-workers, Paul Gunderson.  (Decl. of Michael P. McReynolds ("McReynolds Decl."), Ex. C. at 2, Sept. 25, 2015, Docket No. 76.)  BNSF received the interrogatory answer in July 2011, and it described Dafoe as having "[k]nowledge[] of problems with various safety issues."[2]  (*Id.*)

---

[2] Dafoe originally alleged a different, but related, protected activity – that his name appeared on a witness list for Gunderson and another co-worker's FRSA case.  (Bush Decl. at 3.)  However, BNSF provided uncontroverted evidence that it did not receive the witness list until several months **after** it fired Dafoe, foreclosing the possibility of retaliation.  Dafoe then shifted gears, alleging that his name appeared in Gunderson's interrogatory answer, which BNSF received before he was terminated.

BNSF now moves for summary judgment and also to exclude the testimony of Paul Byrnes, an expert witness offered by Dafoe.

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.     FRSA RETALIATION CLAIM

### A.     Prima Facie Case

The FRSA prohibits BNSF from retaliating against an employee for engaging in a protected activity, including "reporting, in good faith, a hazardous safety or security condition," notifying BNSF of "a work-related personal injury or work-related illness," and providing information in an FRSA matter.   49 U.S.C. § 20109(a)(1), (a)(4), (b)(1)(A).   To establish a prima facie case of retaliation, Dafoe must show that "(i) he engaged in a protected activity; (ii) BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)).   Even if Dafoe establishes this prima facie case, however, BNSF can nonetheless avoid liability if it proves, "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of [Dafoe's] protected activity."   *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)) (internal brackets omitted).

Here, the Court will grant summary judgment for BNSF because there is no genuine issue of material fact as to the fourth element of the prima facie case – Dafoe has not offered evidence sufficient to show that his protected activity was a contributing factor in his dismissal.   Alternatively, even if there is a genuine issue of material fact on this prima facie element, the Court will still grant summary judgment for BNSF because

it has shown, by clear and convincing evidence, that it would have fired Dafoe in the absence of his protected activity.[3]

## B.    Contributing Factor

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* at 791 (quoting Procedures for the Handling of Retaliation Complaints under the Federal Railroad Safety Act, 75 Fed. Reg. at 53,524). To satisfy the contributing factor element of his prima facie case, Dafoe does not need to "conclusively demonstrate [BNSF's] retaliatory motive." *Id.* (quoting *Coppinger-Martin v. Solis,* 627 F.3d 745, 750 (9th Cir. 2010)). Instead, Dafoe need only satisfy a "more lenient 'contributing factor' causation standard." *Id.* at 792. Under this standard, Dafoe must show, "by a preponderance of the evidence," that BNSF intentionally retaliated against him for "engaging in protected activity." *Gunderson v. BNSF Ry. Co.*, No. 14-0223, 2015 WL 4545390, at *8 (D. Minn. July 28, 2015) (quoting *Kuduk,* 768 F.3d at 791). "In other words, although it need not be the determinative factor," Dafoe must establish that "an unlawful retaliatory motive – or

---

[3] BNSF attacks two other elements of Dafoe's prima facie case, arguing that some of his alleged protected activities were not in fact FRSA-protected and that BNSF decision-makers lacked knowledge of some or all of his protected activities. However, the Court will not address these arguments because they do not alter the outcome of the instant motion. Even if the Court assumes that all of Dafoe's activities were protected and that BNSF had the requisite knowledge of at least some of his protected activities – which the Court will do in the analysis below – Dafoe still has not satisfied his summary judgment burden of demonstrating that his protected activity was a contributing factor in his dismissal.

'discriminatory animus' – . . . contributed in some way to [BNSF's] decision." *Id.* (quoting *Kuduk*, 768 F.3d at 791, 791 n.4).

Intentional retaliation can be shown with circumstantial evidence, including "evidence of 'a temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility toward the plaintiff's protected activity, . . . or a change in the employer's attitude toward plaintiff after he/she engaged in protected activity.'" *Id.* at \*9 (quoting *Kuduk v. BNSF Ry. Co.,* 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013), *aff'd,* 768 F.3d 786)).   Here, Dafoe relies on only one category of circumstantial evidence –pretext – to show intentional retaliation.   He makes no arguments regarding temporal proximity, BNSF's shifting explanations, BNSF's antagonism or hostility towards his protected activity, or a change in BNSF's attitude after he engaged in protected activity.   Dafoe's case thus rests on his ability to show that the serious rule violations were a guise for BNSF's true motivation:   retaliating against him for engaging in protected activity.

To show pretext, Dafoe makes five arguments.   First, he asserts that BNSF treated a similarly situated employee, carman David Dodds, in a disparate manner.   According to Dafoe, Dodds was not punished at all for his role in the angle cock incident, even though both men were comparably culpable.   Second, Dafoe contends that BNSF has a pattern of dismissing safety advocates.   Third, Dafoe argues that BNSF has a documented history of improperly retaliating against employees for reporting injuries.   Fourth, Dafoe argues that BNSF coerced him into accepting a serious rule violation for the angle cock incident and then used this violation to justify his dismissal.   Fifth, Dafoe argues that there were flaws

in the investigatory process and that he did not actually commit two of three serious rule violations – bottling air and going between train equipment.

For the reasons discussed below, these arguments, and the evidence supporting them, are insufficient to establish a genuine issue of material fact regarding pretext. Even under the more lenient contributing factor causation standard, a reasonable jury viewing the evidence would be compelled to find that Dafoe's protected activity played no part in his termination.

### 1.      Disparate Treatment of Carman Dodds

The Eighth Circuit has held that "[a] plaintiff may show pretext, among other ways, by showing that an employer . . . treated similarly-situated employees in a disparate manner." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). But, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005)). The plaintiff must show that the other employee is "similarly situated in all relevant respects," including that he or she "dealt with the same supervisor, [had] been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Rodgers*, 417 F.3d at 853; *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)). "Furthermore, '[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness.'" *Id.* (quoting *Rodgers,* 417 F.3d at 853).

Here, Dafoe argues that he was treated in a disparate manner relative to Dodds – if he was punished for failing to check the angle cock, then Dodds also should have been punished for allowing the train to leave the Northtown yard.  According to Dafoe, this disparate treatment is evidence of pretext:  Dafoe was a safety advocate, and Dodds was not; therefore, Dafoe was fired, and Dodds did not even receive a notice of investigation.

Although it is true that Dafoe and Dodds were treated differently, the Court finds that the two men were not similarly situated in all respects and, therefore, the treatment was not disparate.  First, the undisputed evidence in the record shows that Dafoe and Dodds were in different departments and had different supervisors.  Dafoe was a conductor in BNSF's Train, Yard, and Engine ("TYE") department, supervised by John Wright, Matt Bailey, and several other trainmasters.  (Dafoe Dep. 1 at 63:3-17.)  Dodds, on the other hand, was a carman in BNSF's Mechanical Department, supervised by Carlos Canchola.  (Canchola Dep. at 19:2-4.)  Second, as Dafoe's counsel conceded at the motion hearing, John Wright made the decision to issue the notice of investigation to Dafoe, whereas Carlos Canchola made the decision not to issue a notice of investigation to Dodds.  While Dafoe has presented evidence suggesting that Dodds also should have received a notice of investigation, he has done nothing to rebut the fact that they dealt with different supervisors.  Indeed, Canchola testified that Dodds' only responsibility on the roll-by inspection was to "notify the crew"; that Dodds' job did not include stopping the train because "[t]he crew . . . operates the train" and "[a] carman cannot stop a train"; and that he "did not take exception to anything Mr. Dodds did or didn't do."   (Canchola Dep. at 79:11-25; McReynolds Decl., Ex. G ("Canchola Dep. 2") at 78:17-19,80:12-25.)

Regardless of whether Canchola's assessment was erroneous, Dafoe simply has not demonstrated that the supervisor or supervisors who issued the notice of investigation to him were the same individuals who declined to issue one to Dodds.[4]

Furthermore, Dafoe's and Dodds' conduct was not comparably serious. Even assuming that Dodds violated BNSF rules by failing to stop the train, it is uncontested that he fulfilled at least part of his duty by notifying Dafoe over the radio of the angle cock issue. Dafoe, on the other hand, completely violated BNSF rules because he never stopped the train. Finally, the two employees who were the most similarly situated to Dafoe – his crewmates, Jim Layman and Corey Spencer – did receive notices of investigation for the angle cock incident. And, notably, Dafoe does not contend that Spencer was a safety advocate or that he reported personal injuries. This undercuts Dafoe's claim of disparate treatment.

---

[4] Dafoe offers an affidavit from William Fry to show that BNSF managers, including Wright and Canchola, had extensive knowledge of angle cock incident. In the affidavit, Fry states that he held a management position with BNSF from 2006 to 2007. (Decl. of William Allan Fry ("Fry Decl.") ¶ 9, Sept. 25, 2015, Docket No. 77.) During that time, Fry states that he participated in numerous conference calls with other BNSF managers. (*Id.*) On those calls, Fry asserts that the managers openly discussed employees who made safety complaints. (*Id.*) Fry contends that he "know[s] that similar calls continued at least . . . [into] 2014," although he concedes that he was not a participant after 2007. (*Id.*) Based on this affidavit, Dafoe asks the Court to infer that these conference calls took place in 2011 and that through these calls, BNSF managers conspired to punish Dafoe but not Dodds. Yet because Fry lacks personal knowledge regarding whether these calls actually took place in 2011 or, if they did, what was discussed, and instead relies on speculative inferences based on events occurring four to five years earlier, the Court will disregard these allegations. *See Postscripts Enters. v. City of Bridgeton*, 905 F.2d 223, 226 (8th Cir. 1990) (holding that an affidavit, to be competent summary judgment evidence, "must be made on personal knowledge").

## 2.    BNSF's Dismissal of Safety Advocates

Dafoe next asserts that five other "well-known safety advocates" were fired between 2009 and 2012 – David Peterson and Paul Gunderson in 2009, Brian Schwartz in 2010, James Layman in 2011, and Michael Loos in 2012.   Dafoe claims that these firings, along with his own, show that BNSF intentionally retaliates against employees who raise safety issues.   Dafoe offers as evidence (1) his own allegations that these individuals were fired for being safety advocates; (2) an affidavit from Dafoe's former co-worker and investigation representative William Fry, in which Fry speculates, among other things, that "[i]t simply cannot be coincidental that these men, all long time employees, suddenly committed egregious rule violations warranting dismissal," (Decl. of William Allan Fry ("Fry Decl.") ¶ 11, Sept. 25, 2015, Docket No. 77.); and (3) a transcript from Gunderson's and Peterson's FRSA hearing, in which Peterson contends that all of the men, including Dafoe, were fired for being safety advocates.[5]

Importantly, however, Dafoe offers no evidence to show that Peterson, Gunderson, Schwartz, Layman, or Loos ever prevailed in demonstrating intentional retaliation by BNSF.   In fact, two of the men, Gunderson and Loos, brought similar retaliation claims in separate federal actions and both actions were recently dismissed on summary

---

[5] Dafoe also offers an affidavit from Brian Schwartz, a former BNSF employee who similarly contends that he and the others were terminated for raising safety complaints.   The Court will not consider this affidavit, however, because Dafoe failed to disclose Schwartz as a potential witness during discovery and he has not established that this "failure was substantially justified or is harmless."   Fed. R. Civ. P. 37(c)(1); *see Loos v. BNSF Ry. Co.*, No. 13-3373, 2015 WL 3970169, at *6 n.4 (D. Minn. June 30, 2015) (declining to consider an affidavit from an undisclosed witness on a summary judgment motion).

judgment by courts in this district.  *See Gunderson*, 2015 WL 4545390; *Loos v. BNSF Ry. Co.*, No 13-3373, 2015 WL 3970169 (D. Minn. June 30, 2015).  Additionally, Dafoe has failed to rebut evidence that BNSF responded positively to many of his safety complaints.  *See Sosby v. Miller Brewing Co.*, 211 F. App'x 382, 388 (6th Cir. 2006) (granting summary judgment for defendant on retaliation claim in part because plaintiff failed to contest evidence that the defendant "responded positively to her complaints").  BNSF's internal SIRP records, which Dafoe does not contest, show that the railroad took corrective action in response to all of his official complaints.  (*See* Hall-Lopez Decl., Ex. Q.)  And, Dafoe conceded in his deposition that BNSF sprayed for weeds, corrected problems in Dassel, corrected lighting in the Willmar yard, and responded positively to one at least of his SIRPs.  (Dafoe Dep. 1 at 108:6-8; 129:6-19; 131:19-24; 139:2-5.)  Dafoe's speculative evidence that BNSF targeted safety advocates is thus insufficient to create a genuine issue of material fact.

### 3.    BNSF's Past Retaliation for Injury Reports

Dafoe's next argument regarding pretext is that BNSF has a documented history of retaliating against employees for reporting injuries.  Dafoe cites a 2013 accord between BNSF and OSHA, in which BNSF agreed to cease its practice of giving employees longer probationary periods for serious rule violations if the employee had previously reported a personal injury.  (McReynolds Decl., Exs. A, B.)  Dafoe also offers his own deposition testimony and the Fry affidavit.  Both men speculate that BNSF retaliated against employees for reporting injuries.  Based on this purported practice, Dafoe asks

the Court to infer that BNSF similarly retaliated against him and that the serious rule violations were pretextual.

The Court declines to draw this requested inference and instead finds that the above evidence does not support a genuine factual dispute for trial. The 2013 accord is entirely unrelated to Dafoe's case, and Dafoe has presented no evidence that BNSF's alleged practice of giving longer probationary periods to those reporting injuries in any way impacted his situation. Dafoe was dismissed for serious rule violations occurring on the same day, and not as a result of having a longer probationary period due to an injury report. If the Court allowed Dafoe to rely on the 2013 accord as circumstantial evidence of pretext in such an unrelated case, then conceivably any BNSF employee could also do so, and summary judgment would never be appropriate in an FRSA retaliation action based on personal injury reports. Dafoe's deposition testimony and the Fry affidavit are similarly unavailing – speculation is not competent summary judgment evidence.

### 4. Coercion Regarding the Angle Cock Waiver

Dafoe next argues that he was coerced into waiving his right to an investigation for the angle cock incident and into accepting a record suspension. Dafoe contends that two of his supervisors, John Wright and Matt Bailey, counseled him to sign the waiver, telling him that the waiver would "benefit" him "because then [he] would only have one level S [serious rule violation] to fight." (*Id.*, Ex. E ("Dafoe Dep. 2") at 92:5-22.) Dafoe asserts that these comments led him "to believe that the second one [i.e., the other alleged serious rule violations] I could win and I wouldn't get dismissed if I signed this waiver."

(*Id.*)  According to Dafoe, these comments evidence pretext because they demonstrate that BNSF tricked or coerced him into accepting the waiver so that it could later use it as a factor in firing him.

The Court rejects this argument for several reasons.  First, Dafoe has not actually offered evidence of coercion.  Dafoe does not contend that Wright or Bailey expressly told him that he would prevail in the other investigations if he signed the waiver.  Instead, this was Dafoe's own interpretation of their comments.  Additionally, even if Wright or Bailey did coerce him into signing the waiver, this still does not establish intentional retaliation by a preponderance of the evidence.  Dafoe was found to have committed two other serious rule violations during the same tour of duty, which is stand-alone dismissible conduct under PEPA.  Thus, Dafoe still could have been fired even if the angle cock incident had never occurred.

### 5.    Falsity of BNSF's Explanation for Dafoe's Dismissal

Dafoe lastly argues that BNSF's stated reasons for dismissing him were pretextual because the investigatory process was not fair and impartial, and the evidence shows that he did not actually commit two of three serious rule violations (bottling air and going between train equipment).  Dafoe offers expert testimony from Byrnes, who opines that the evidence conclusively shows that Dafoe did not commit the serious rule violations.  Byrnes also opines that BNSF maintained crucial event data in a form that is difficult to read and interpret.  Dafoe also relies on Byrnes' testimony, his own deposition testimony, and an affidavit from William Fry, to argue that the investigation was partial; that

BNSF's witness, Jake Demarais, testified to get the result that the company wanted; and that BNSF failed to consider exculpatory evidence.

This evidence, while probative as to the question of whether Dafoe actually committed the serious rule violations, is insufficient to show pretext.  As the Eighth Circuit has held, "'federal courts do not sit as a super-personnel department that re-examines' an employer's disciplinary decisions.  In the absence of evidence connecting his protected activity to the discharge, [an employee] is not entitled to FRSA anti-retaliation relief even if BNSF inaccurately concluded that he committed [serious rule violations]." *Kuduk*, 768 F.3d at 792 (quoting *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 898 (8th Cir. 2002)).  Here, because Dafoe has not offered viable evidence connecting his protected activity to his discharge, the Court will not assume the role of super-personnel department.

Moreover, "it is not unlawful for a company to make employment decisions based upon erroneous information and evaluations." *Id.* (quoting *Allen v. City of Pocahontas*, 340 F.3d 551, 558 n. 6 (8th Cir. 2003)).  Thus, even if BNSF maintained event recorder data in an inconvenient form, failed to consider certain evidence, or relied on deficient evidence, this conduct, in and of itself, is not unlawful.  Dafoe must show that this purported conduct was a pretext for intentional retaliation, and he has not done so.  BNSF has offered undisputed evidence that the manner in which it preserved the event recorder data from Dafoe's train was a standard practice.  (Second Decl. of Joanne R. Bush, Ex. A. at 50:1-20, Oct. 30, 2015, Docket No. 85.)   Standard practices are not evidence of individual intentional retaliation.  Moreover, even if the Court were to accept that BNSF

failed to consider exculpatory evidence, that it relied on deficient evidence, or that Demarais testified to get the result that the company wanted, Dafoe "points to no evidence suggesting that BNSF's decision-making process, even if flawed, would have come out differently in the absence of [his protected activity]." *Kuduk*, 768 F.3d at 793; *see Gunderson*, 2015 WL 4545390, at *13 (finding that the plaintiff's allegations of witness coaching did not establish pretext because "the formal investigation is an adversarial process" and there was no evidence of "hostility to [the employee's] protected activity").[6]

Finally, "'[t]he critical inquiry' for pretext 'is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *Gunderson*, 2015 WL 4545390, at *11 (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 997 (8th Cir. 2011)).  In the instant action, not only has Dafoe failed to show lack of good faith, but a reasonable jury viewing the evidence would be compelled to reach the opposite conclusion – that BNSF made the termination decision in good faith.

---

[6] Dafoe also argues that BNSF's investigations are "one-sided" because BNSF controls the investigation process, his attendance at the investigation was mandatory, and he did not have the benefit of being represented by an attorney.  Dafoe suggests that the one-sided nature of the investigation is evidence of pretext.  But the Court rejects this argument.  Most significantly, the investigatory framework was created pursuant to the CBA between BNSF and UTU, of which Dafoe is a member.  Additionally, the framework includes numerous employee safeguards, including the right to be represented by a fellow employee, an internal right of appeal, the right to appeal to the PLB, the right to file an OSHA complaint, and the right to file an action in federal court.

Significantly, BNSF has produced undisputed evidence that Michael Lund, the individual who conducted the initial analysis of the event recorder data and made the initial recommendation that notices of investigation be issued, reviewed Dafoe's train as a part of a **random** safety audit.  And, Albanese based his ultimate termination decision on an ample quantity of evidence, including the event recorder data; radio transcripts; input from Lund; and testimony taken at the investigation, where Dafoe "enjoyed an array of rights, including the right to be represented by his union, the right to introduce evidence, the right to testify, and the right to cross-examine the witnesses against him." *Id.* at *12.  Even if Albanese misinterpreted the evidence before him, Dafoe points to nothing suggesting bad faith or that Albanese's decision was motivated by Dafoe's protected activity.

Other factors also support the conclusion that BNSF's stated reason for discharge, even if mistaken, was not a pretext for intentional retaliation.  First, Dafoe has not shown that Albanese, the individual who made the termination decision, had anything more than limited knowledge of his protected activity.  *See Kuduk*, 768 F.3d at 791 (holding that a plaintiff **must** show that the "discharge decision makers" had actual or constructive knowledge of the protected activity in order to succeed in an FRSA retaliation action).  Dafoe testified in his deposition that he complained to Albanese over the phone on two or three occasions regarding safety issues – snow removal and air brake testing.  But, Albanese only arrived in the Twin Cities in April 2011 and thus was not present when Dafoe made the vast majority of his other safety complaints over the preceding 15 years.  Dafoe furthermore has not offered any evidence establishing that Albanese had

knowledge of his personal injury reports or his appearance in Gunderson's interrogatory answer.[7]

Dafoe also has not shown that Albanese or anyone else directly involved in the decision-making process harbored any antagonism or hostility towards him for his protected activity. Lund testified in his deposition that he has a good relationship with Dafoe and that he has no knowledge of Dafoe's purported safety advocacy. (Lund Dep. at 62:6-63:22.) Director of Labor Relations Andrea Smith, who reviewed and concurred with Albanese's dismissal recommendation, testified in her deposition that she had never even heard of Dafoe until she was asked to review the investigation materials and render an opinion. (Smith Dep. at 26:17-21.) Dafoe does not contest either piece of testimony. The only evidence that Dafoe offers regarding Albanese's hostility towards his protected activities are his own personal assessments that he had an "uncomfortable" conversation with Albanese after reporting the snow removal issue and that Albanese was "intimidating." (Dafoe Dep. 2 at 120:12-19, 123:5-124:1.) But these speculative and unsupported allegations alone cannot give rise to a genuine factual dispute regarding pretext or lack of good faith – it is not uncommon that an employee might find his or her boss to be intimidating.

The Court also finds it significant that Dafoe's "protected activity . . . was completely unrelated to the . . . incident that led to his discharge" and that "[t]he facts

---

[7] Dafoe again points to the Fry affidavit and the purported weekly conference calls to argue that Albanese had extensive knowledge of his protected activities. (Fry Aff. ¶ 9.) But, as the Court has already held, this allegation is not competent evidence on summary judgment because it is not based on personal knowledge. *See Postscripts Enters.*, 905 F.2d at 226.

surrounding" Dafoe's protected activity "shared no nexus with the later" serious rule violations. *Kuduk*, 768 F.3d at 792. These violations can instead be characterized as "intervening event[s] that *independently* justified adverse disciplinary action" – this weighs against a finding of pretext. *Id.*

Lastly, the fact that Dafoe made numerous safety complaints and personal injury reports over a period of fifteen years without BNSF taking any adverse action against him belies his claim that the serious rule violations were a facade for retaliation or that Albanese lacked good faith. *See, e.g.*, *Reid v. Neighborhood Ass'n Corp. of America,* 749 F.3d 581, 589 (7th Cir. 2014) (declining to draw an inference of retaliatory intent where the plaintiffs had been complaining about the same issue for six months prior to their dismissal). Even the two safety complaints that Dafoe made directly to Albanese were old complaints; he complained about snow removal since 1996 and air brake testing since 2009. (Dafoe Dep. 1 at 108:11-13, 122:2-10, 159:17-23.)[8] And, as noted above, BNSF responded positively to many of Dafoe's safety complaints, whether made formally or informally.

Overall, Dafoe has failed to present sufficient evidence that his protected activity was a contributing factor to his dismissal. Dafoe relies on pretext to show intentional

---

[8] Dafoe argues that the fact that his complaints persisted for multiple years without retaliation should carry no weight in the railroad context because BNSF "has a unionized work-force," it "has to go through a formal investigation process," and it therefore "bides its time as it tries to find grounds to dismiss troublesome safety advocates." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 35, Sept. 25, 2015, Docket No. 75 (citing Fry Aff. ¶ 10).) Yet outside of Fry's speculative affidavit, Dafoe offers no evidence, direct or circumstantial, to support this allegation. Dafoe cannot prevail based on mere conspiracy theories.

retaliation, but has offered only speculation, conjecture, and tenuous inferences.  Even under the more lenient contributing factor causation standard, viewing the evidence in the light most favorable to Dafoe, no reasonable jury could find in his favor.  Accordingly, the Court will grant summary judgment for BNSF.

### C.    Clear and Convincing Evidence

Alternatively, even if there is a genuine issue of material fact regarding whether Dafoe's protected activity was a contributing factor in his dismissal, BNSF is still entitled to summary judgment because it has shown, by clear and convincing evidence, that it would have fired Dafoe even in absence of his protected activity.  *See Kuduk*, 768 F.3d at 789.

In assessing whether BNSF has made this clear and convincing showing, the Court considers the following non-exclusive factors: (1) whether the railroad has written policies addressing the alleged misconduct, *see Gunderson*, 2015 WL 4545390, at *14; (2) whether the railroad followed applicable investigatory and disciplinary procedures, *see Kuduk*, 768 F.3d at 792; (3) whether the dismissal was "approved by others in senior management," *see id.*; (4) whether the dismissal was upheld on appeal, *see Gunderson*, 2015 WL 4545390, at *14; (5) the "temporal proximity between the non-protected conduct and the adverse actions," *see id.*; (6) whether the railroad consistently enforces the policies and rules at issue, *see Kuduk*, 768 F.3d at 793; and (7) "the independent significance . . . of the non-protected activity," *Gunderson*, 2015 WL 4545390, at *14.  Although "this affirmative defense is often not suitable for summary judgment

determination," it is nevertheless appropriate if the railroad satisfies its clear and convincing evidentiary burden.  *Kuduk*, 768 F.3d at 793.

Here, **all** of the above factors support a finding that BNSF would have fired Dafoe even if he had not made safety complaints, reported his injuries, or appeared in Gunderson's interrogatory answer.

First, the railroad has clear written policies prohibiting bottling air, going between train equipment without following safety procedures, and operating a train with a slightly closed angle cock.  (Hall-Lopez Decl., Exs. A, C.)  And, each violation qualifies as a serious rule violation.  (*Id.*, Ex. G at 5.)  Under PEPA, if an employee commits "[m]ultiple [s]erious violations . . . during the same tour of duty," that constitutes a stand-alone dismissible violation, for which an employee may be dismissed immediately.  (*Id.* at 4, 6.)

Second, there is evidence that the railroad followed applicable investigatory and disciplinary procedures.  BNSF issued proper notices of investigation after learning of Dafoe's alleged violations.  BNSF then held an investigation, in which another employee represented Dafoe.  Dafoe had the opportunity to present witnesses, to offer evidence, and to question BNSF witnesses.  The decision maker, Albanese, reviewed multiple sources, including the investigation transcript, exhibits, the event recorder data, and radio transcripts.  Albanese also consulted with Michael Lund.

Third, it is undisputed that Albanese's decision was reviewed and approved by Andrea Smith, Director of Labor Relations and a member of BNSF's senior management. (Bush Decl., Ex. JJ.)

Fourth, Dafoe's dismissal was upheld on appeal on multiple occasions.  He lost two appeals pursuant to the CBA.  He then lost an appeal before PLB.  And, OSHA rejected his subsequent complaint.

Fifth, there was a close temporal proximity between Dafoe's non-protected conduct – the alleged serious rule violations – and his termination.  Dafoe received notices of investigation for the August 20, 2011 incidents on August 23 and 25, 2011.  An investigation was promptly held on September 13, 2011.  Dafoe was then terminated on September 26, 2011.  Everything took place in a little more than one month.

Sixth, there is evidence that BNSF consistently enforced the applicable policies that precipitated Dafoe's dismissal against other employees.  Between 2008 and 2011, for example, BNSF dismissed two employees for bottling air.  (Hall-Lopez Decl., Ex. P at 2, 8.)  On five occasions between 2010 and 2013, BNSF assessed a serious rule violation and suspended an employee for 30 days for going between train equipment.  (*Id.* at 3-4, 6-7, 9.)  And, in 2010, BNSF assessed a serious rule violation and suspended an employee for 10 days for going between train equipment.  (*Id.* at 10.)

Seventh and finally, Dafoe's non-protected conduct was independently significant.  In other words, Dafoe's alleged serious rule violations were unrelated to his safety complaints, injury reports, and his appearance in Gunderson's interrogatory answer.  Absent this protected activity, Dafoe still would have been subject to dismissal under PEPA because the serious rule violations occurred during the same tour of duty, which is stand-alone dismissible conduct.

In the Court's view, the above evidence clearly and convincingly indicates that BNSF would have fired Dafoe in absence of his protected activity.  Accordingly, the Court will grant summary judgment for BNSF.[9]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant's Motion for Summary Judgment [Docket No. 60] is **GRANTED**.

2.      Defendant's Motion to Exclude Expert Testimony [Docket No. 54] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  February 26, 2016                         s/ John H. Tunheim
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                              Chief Judge
                                               United States District Court

---

[9] Because the Court will grant BNSF's motion for summary judgment, it need not reach BNSF's motion to exclude the expert testimony of Paul Byrnes.  The Court will therefore deny that motion as moot.